Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>Vs.<br><br>KENNETH A. RABELO RODRÍGUEZ<br><br>Apelante | KLAN202301111 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Sala: 302<br><br>Casos: EIS2023G0015 EIS2023G0017<br><br>Por: Art. 130 (A) CP (2 cs) |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 25 de junio de 2025.

El apelante, señor Kenneth A. Rabelo Rodríguez, comparece y solicita la revocación de la sentencia dictada por el Tribunal de Primera Instancia, Sala de Caguas, el 16 de noviembre de 2023. El apelante resultó convicto por cometer el delito de agresión sexual tipificado en el Articulo 130(A) del Código Penal, 33 LPRA sec. 519. En consecuencia, el tribunal impuso al apelante una pena de reclusión de 50 años.

Por los fundamentos expuestos en esta sentencia, *confirmamos* la sentencia apelada.

**-I-**

Por hechos ocurridos durante el 2020 y 2021, el apelante fue acusado por transgredir el Articulo 130 (A) del Código Penal. Específicamente, el Ministerio Público presentó dos acusaciones en contra de la parte apelante. Estas leen:

> El referido imputado, Kenneth Abimael Rabelo Rodríguez allá para el año 2020, en Las Piedras, Puerto Rico, que forma parte de la jurisdicción del

Tribunal de Primera Instancia, Sala Superior de Caguas, ilegal, voluntaria, maliciosa y criminalmente, a propósito, y con conocimiento llevó a cabo una relación sexual vaginal, siendo la víctima A.M.P.F. al momento de los hechos menor de dieciséis (16) años de edad. Consistente en que la obligó a tener relaciones sexuales en su casa en Las Piedras.

El referido imputado, Kenneth Abimael Rabelo Rodríguez allá en o para el año 2021, en Las Piedras, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala Superior de Caguas, ilegal, voluntaria, maliciosa y criminalmente, a propósito, y con conocimiento llevó a cabo una relación sexual vaginal, siendo la víctima A.M.P.F. al momento de los hechos menor de dieciséis (16) años de edad. Consistente en que estando en menstruación la menor la obligó a tener relaciones sexuales.

El juicio por derecho ocurrió los días 8, 22 y 30 de agosto de 2023 y culminó con el veredicto de culpabilidad sobre el apelante. Durante el juicio en su fondo el Ministerio Público presentó el testimonio de: (1) la perjudicada Angélica M. Pérez Flores; (2) el señor Ángel G. Pérez Peña; (3) señora Omayra Flores Rodríguez; (4) y la agente Mari Liza Dones Ramos. La defensa interrogó a la agente Olivette Esteras Rivera y las partes estipularon los recibos de los celulares de la perjudicada. El Tribunal de Primera Instancia encontró culpable al apelante por los delitos imputados.[1] Como resultado, lo condenó a una pena de cárcel de 50 años. Inconforme, el 11 de diciembre de 2023, el apelante compareció mediante escrito de apelación.[2] Formuló los siguientes errores:

Erró el Honorable Tribunal de Primera Instancia al encontrar culpable al apelante en virtud de una prueba que no derrotó la presunción de inocencia y mucho menos estableció su culpabilidad más allá de duda razonable.

Erró el Honorable Tribunal de Primera Instancia al permitir y considerar, con objeción de la defensa, testimonio oral sobre el contenido de unos alegados mensajes de texto que nunca fueron presentados en

---

[1] Al apelante se le imputaban tres cargos por Art. 130 A CP Grave (2012) y dos cargos por Art. 3.1 Grave (1989). El 30 de agosto de 2023 el Tribunal lo encontró culpable por dos cargos de Art. 130 A CP Grave (2012) y por un cargo de Art. 3.1 Grave (1989). No fue encontrado culpable por un Art. 130 A CP (Grave) y por un Art. 3.1 Grave (1989).

[2] El apelante también fue sentenciado por violar el Artículo 3.1 de la Ley para la Prevención e Intervención con la Violencia Doméstica. No obstante, no cuestiona la sentencia impuesta por tal delito.

evidencia ni descubiertos oportunamente por la defensa.

El Procurador General también compareció mediante alegato escrito y argumenta a favor de la confirmación de la sentencia apelada. Luego de examinar el expediente de autos y la transcripción estipulada de la prueba, estamos en posición de expresarnos.

-*II*-

-*A*-

Es norma establecida, que "la determinación de si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación [debido a que] la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y de [D]erecho". *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002). En materia de Derecho Penal nuestra función revisora consiste en evaluar si se derrotó la presunción de inocencia del acusado y si su culpabilidad fue evidenciada por el Estado más allá de duda razonable, luego de haberse presentado "prueba respecto a cada uno de los elementos del delito, su conexión con el acusado y la intención o negligencia criminal de este último". *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000). En *Pueblo v. Irizarry, supra*, págs. 788-789, el Tribunal Supremo pautó:

> No cabe duda que, en el ejercicio de tan delicada función revisora, no podemos abstraernos de las limitaciones que rigen el proceso de evaluación de la prueba por parte de un tribunal apelativo. Al enfrentarnos a la tarea de revisar cuestiones relativas a convicciones criminales, siempre nos hemos regido por la norma a los efectos de que la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador por lo cual los tribunales apelativos sólo intervendremos con dicha apreciación cuando se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto. ... Sólo ante la presencia de estos elementos y/o cuando la apreciación de la prueba no concuerde con la realidad fáctica o ésta sea inherentemente imposible o increíble, ... habremos de intervenir con la apreciación efectuada.

Así pues, "[h]asta tanto se disponga de un método infalible para averiguar sin lugar a duda dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia." *Pueblo v. Carrasquillo*, 102 DPR 545, 552 (1974). Como ya establecimos, en nuestro ejercicio como tribunal revisor impera la norma de deferencia al juzgador de los hechos. Esto último, responde al hecho de que el juzgador de hechos es quien está en mejor posición de evaluar la prueba presentada y dirimir credibilidad, pues es este quien tuvo la prueba ante sí. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62-63 (1991). Por ello, solamente intervendremos cuando surja que el foro de instancia incurrió en error manifiesto, prejuicio o parcialidad en el ejercicio de la delicada faena de apreciar la prueba. *Pueblo v. Cabán Torres*, 117 DPR 645, 654 (1986). Es importante señalar que aun en los casos en los que existan "contradicciones en las declaraciones de un testigo, eso de por sí solo, no justifica que se rechace dicha declaración en su totalidad si las contradicciones no son decisivas y si el resto del testimonio es suficiente para establecer la transacción delictiva, superar la presunción de inocencia y establecer la culpabilidad más allá de duda razonable". *Pueblo v. Ramos Álvarez*, 122 DPR 287, 317 (1988).

### -B-

La sección 11 del artículo II de la Constitución del Estado Libre Asociado de Puerto Rico establece los derechos fundamentales que le asisten a toda persona acusada de la comisión de un delito. Entre los derechos allí reconocidos está el derecho a gozar de la presunción de inocencia. Para rebatir esta presunción se requiere la presentación de evidencia que establezca la culpabilidad del acusado más allá de duda razonable. El peso de la prueba recae en el Estado, quien deberá presentar evidencia sobre la existencia de todos los elementos del delito y su conexión

con el acusado. Por ello, la culpabilidad del acusado no tiene que probarse con certeza matemática. Lo que se exige es prueba satisfactoria y suficiente en Derecho, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Toro Martínez*, 200 DPR 834, 848 (2018).

A su vez, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R.110, viabiliza este mandato constitucional al disponer lo siguiente:

> En todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. Si la duda es entre grados de un delito o entre delitos de distinta gravedad sólo podrá condenársele del grado inferior o delito de menor gravedad.

La "presunción de inocencia" se traduce en que todo acusado se considera "inocente" hasta que el Estado pruebe que es culpable más allá de duda razonable mediante la presentación de prueba suficiente y satisfactoria sobre cada uno los elementos del delito imputado y su comisión por el acusado. El Tribunal Supremo de Puerto Rico caracterizó la presunción de inocencia como "el pilar del sistema penal puertorriqueño del cual surgen derechos corolarios, como la garantía al acusado [de] que no permanecerá detenido preventivamente, en espera del juicio, en exceso de seis meses y el derecho a la libertad bajo fianza". *Pueblo v. Pagán Medina*, 175 DPR 557, 567-568 (2009).

Por ello, la garantía constitucional a la "presunción de inocencia" acompaña al imputado de delito desde el inicio de la acción penal hasta el fallo o veredicto de culpabilidad. E. Chiesa Aponte*, Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Vol. II, Forum, 1992, pág. 111. La prueba requerida al Estado es aquella que produzca "certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido".

*Pueblo v. Irizarry, supra*, pág. 787. El Tribunal Supremo describió la referida prueba como la que establece "aquella certeza moral que convence dirige la inteligencia y satisface la razón". *Pueblo v. Bigio Pastrana*, 116 DPR 748, 761 (1985); *Pueblo v. Gagot Mangual*, 96 DPR 625, 627 (1968).

Por último, es importante enfatizar que es al Estado a quien corresponde presentar la prueba, directa o circunstancial, de todos los elementos del delito y de la conexión del acusado con el mismo. Si el Estado no logra establecer lo anterior, más allá de duda razonable, no procede una convicción, independientemente de la credibilidad que la prueba le haya merecido al juzgador de los hechos. *Pueblo v. Colón, Castillo*, 140 DPR 564, 581 (1996).

-*C*-

El Artículo 130 (A) del Código Penal, 33 LPRA sec. 5191, tipifica la agresión sexual contra un menor de 16 años. El artículo penaliza a toda persona que, a propósito, con conocimiento o temerariamente, lleve a cabo, o que provoque que otra persona lleve a cabo, un acto orogenital o una penetración sexual vaginal o anal ya sea ésta genital, digital, o instrumental. La pena establecida para el delito es un término fijo de cincuenta (50) años, que deberá cumplir en años naturales, más la pena de restitución, salvo que la víctima renuncie a ello.

Las víctimas de agresión sexual experimentan diversas lesiones graves de carácter psicológico que se manifiestan desde tener miedo, ansiedad, depresión, confusión, hasta auto estima baja. *Pueblo v. Rivera Robles*, 121 DPR 858, 861 (1988). En el caso de los menores las lesiones emocionales quedan agravadas debido a su corta edad e inmadurez. *Íd.* Para un menor, la agresión sexual es un acto de dominación ante el cual se siente impedida de evitar por miedo a un daño. *Íd.*, 863. Por tanto, "la credibilidad de la víctima ha de evaluarse tomando en cuenta su edad, personalidad,

si es tímida e indecisa o resuelta y determinada; educación y escolaridad; tipo de núcleo y grado de estabilidad familiar; condición física y mental, grado de madurez[.] En muchas instancias su silencio posterior por días, y hasta años no debe sorprendernos". *Íd.*, pág. 864. El abuso sexual contra un menor, en la mayoría de los casos ocurre por meses y años. *Íd.* Además, "[l]a naturaleza del delito cometido, el estigma personal y social que conlleva, la ambivalencia ante el agresor adulto, en particular si éste es la figura dominante". *Íd.*

### -D-

Las Reglas 104 y 105 de Evidencia, 32 LPRA Ap. VI, establecen el procedimiento a seguir ante la admisión o exclusión errónea de evidencia. La Regla 104(a) de Evidencia requiere que la parte perjudicada por la admisión errónea de evidencia presente una objeción "oportuna, específica y correcta" o una moción que solicite que se elimine del récord, de surgir con posterioridad el fundamento para su exclusión. Sobre el efecto que tendrá el error en la admisión o exclusión de evidencia, la Regla 105(a) de Evidencia, *supra*, indica lo siguiente, en su parte pertinente:

(a) Regla general. No se dejará sin efecto una determinación de admisión o exclusión errónea de evidencia ni se revocará por ello sentencia o decisión alguna a menos que:

(1) La parte perjudicada con la admisión o exclusión de evidencia hubiere satisfecho los requisitos de objeción, fundamento u oferta de prueba establecidos en la Regla 104 de este apéndice, y

(2) el tribunal que considera el señalamiento estime que la evidencia admitida o excluida fue un factor decisivo o sustancial en la sentencia emitida o decisión cuya revocación se solicita.

La revocación de una sentencia por la admisión o exclusión errónea de evidencia requiere la correspondiente objeción, según dispuesto en la Regla 104 y que el tribunal considere "que el error tuvo un efecto sustancial en el dictamen que se quiere revocar". E.

Chiesa, *Reglas de Evidencia de Puerto Rico: Análisis por el Prof. Ernesto L. Chiesa,* San Juan, Publicaciones JTS, 2009, pág. 87. Si se comete un error en materia de derecho probatorio pero el tribunal estima que ello no tuvo un efecto significativo sobre el dictamen recurrido, puede confirmarlo, pese al error, que se ha denominado *"harmless error".* E. Chiesa, *op. cit.* pág. 88. Al respecto, el Profesor Ernesto Chiesa comenta:

> El criterio es *"lo más probable"* o *"more likely than not".* Esto ocurre en relación con errores que han sido llamado *"trial errors"* … En el *"trial error"*, el tribunal hace un ejercicio cuantitativo al estimar el efecto del error. Si se trata de un error de admisión errónea de evidencia, la corte revisora *"saca"* del juicio o vista la evidencia erróneamente admitida y se pregunta si con el resto de la evidencia lo más probable es si el resultado hubiera sido el mismo.

Así, una vez la parte afectada por la alegada admisión errónea de evidencia demuestra que la objetó oportuna y correctamente, le corresponde al tribunal apelativo determinar si la admisión "fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita". *Pueblo v. Ruiz Bosch*, 127 DPR 762, 781 (1991). El análisis procedente no puede limitarse a considerar si hay otra prueba que demuestre la culpabilidad del apelante más allá de toda duda razonable. *Pueblo v. Rosaly Soto*, 128 DPR 729, 744-745 (1991). En vez, el criterio aplicable es "si de no haberse admitido erróneamente la prueba en controversia probablemente el resultado hubiera sido distinto." *Íd.*; *Pueblo v. Mangual Hernández,* 111 DPR 136, 145 (1981). En otras palabras, si la prueba que erradamente se admitió pudo "haber tenido una influencia notable, determinante, y hasta desmedida, en la mente del juzgador de los hechos en relación con el veredicto, fallo o sentencia que el mismo emitiera en el caso sea este civil o criminal". *Pueblo v. Rosaly Soto,* 128 DPR 729, 745 (1991).

De ordinario, no puede traerse en apelación un señalamiento de error que no se presentó ante la consideración del foro primario.

E. Chiesa, *op. cit.*, pág. 89. Aun si la parte incumple con la Regla 104 de Evidencia podremos considerar su señalamiento de error sobre exclusión o admisión de prueba. Regla 106, 32 LPRA Ap. VI. Habrá de ser un "error extraordinario" y procederá si se cumplen las siguientes condiciones: (a) el error fue craso, pues es indudable que se cometió, (b) el error fue perjudicial, pues tuvo un efecto decisivo sobre el dictamen recurrido o (c) de no corregirse, fracasaría la justicia. *Íd.*; *Pueblo v. Bonilla Peña,* 183 DPR 335, 348 (2011).

### -III-

Por medio de su primer señalamiento de error, el apelante asegura que la prueba aportada por el Estado es insuficiente y no logró establecer los elementos del delito imputado y su conexión con el acusado. Aduce que, la fecha de nacimiento de la perjudicada no quedó establecida. Postula el "deber" del Estado en: (1) certificar con documento oficial la fecha de nacimiento de la testigo; (2) demostrar que el suceso alegado ocurrió en una fecha anterior al cumpleaños número 16 de la perjudicada. Concluye que, debido a estas circunstancias el Ministerio Público no "probó más allá de duda razonable que la testigo tuviese 15 años al momento de los hechos imputados en la acusación".

En lo que respecta a los elementos del delito, la suficiencia de la declaración de la perjudicada es incuestionable. Ante el tribunal contestó y expuso los elementos del delito según su capacidad, escolaridad y edad. Verbalizó la manera en que, para el año 2020 la perjudicada se escapaba de la casa de su "mamá en Gurabo" para encontrarse con el apelante para ir "pa´ la casa de él" en Las Piedras.[3] Las escapadas del hogar maternal ocurrieron "muchas veces" durante el año 2020.[4] La perjudicada añadió que

---

[3] Transcripción de la prueba oral, págs. 29-30.
[4] *Íd.*, págs. 25-26.

en la casa de Las Piedras tuvo relaciones sexuales con el apelante "más de tres" veces.[5] En una de esas ocasiones, a pesar de que "no quería tener relaciones sexuales con él", "después le dije que, que sí".[6] Según el testimonio de la víctima este último incidente ocurrió en el año 2020 cuando tenía 15 años.[7] El testimonio del padre de la víctima, el señor Ángel Gabriel Pérez Peña, testificó sobre el momento cuando advino en conocimiento de la relación entre el apelante y su hija. Esto ocurrió cuando el padre encontró una foto del apelante en el dispositivo móvil de su hija. En ese momento decidió acudir a la casa de su vecino, el padrastro del apelante, con el propósito de confrontar al apelante. El apelante, sin reparo, confirmó sostener relaciones sexuales regularmente con su hija. El apelante explicó la forma como procuraba a su hija y el lugar donde cometía la agresión sexual. El padre de la víctima explicó que, el incidente ocurrió cuando su hija tenía 15 años:

> Juez: Pero cuándo usted se enteró de que él tenía una relación de noviazgo o de pareja como usted dijo, con su hija.
>
> T. Á. Pérez: Cuando mi hija tenía 15 años.
>
> Juez: Cuando tenía 15, usted se enteró de la relación.
>
> T. Á. Pérez: Correcto.
>
> [...]
>
> F. Sánchez: ¿Qué usted hizo una vez usted vio la foto del señor Kenneth Rabelo en el celular de su hija?
>
> T. Á. Pérez: Pues, Kenneth Rabelo Rodríguez vivía al frente de mi casa, yo cruzo la calle, allí se encontraba el, el, el padrastro y yo le solicito hablar con Kenneth Rabelo Rodríguez y estaba también la señora madre de Kenneth. La cual también se personó y frente a los tres, yo le pregunté a Kenneth que ¿qué relación guardaba con mi hija?
>
> F. Sánchez: Le pregunto, ¿qué le contestó el señor Kenneth Rabelo Rodríguez.
>
> T. Á. Pérez: Kenneth, Kenneth Rabelo Rodríguez recuerdo, que se estaba eh, me estaba diciendo que si yo estaba grabando la conversación. Y yo le dijo que no

---

[5] *Íd.*
[6] *Íd.*
[7] *Íd.*

estaba grabando la conversación, que solamente quería saber, que estaba pasando con él y con mi hija. A lo que él me afirmó que estaba teniendo relaciones sexuales con mi hija.

F. Sánchez: Ok. ¿Qué usted procede hacer con esa información?

T. Á. Pérez: Eh, bueno, en un acto, no, no esperaba esa contestación, estaba nervioso, tembloroso y tratando de canalizar mis emociones, lo que le dije fue, sí, le pregunté directamente, dime la verdad y sé honesto conmigo por favor. ¿Has tenido relaciones sexuales con mi hija? A lo que él me respondió que sí. Entonces yo le pregunto ¿en qué momento? Porque mi hija no sale de mi casa, si no es acompañada. Y entonces él me contestó, que habían tenido relaciones sexuales con mi hija en el área de Gurabo, en, en, cuando mi hija se iba con la mamá. Porque la custodia de mi hija era compartida para ese momento. Y estaba un fin de semana con, en mi casa y un fin de semana con la mamá. Entonces él entró en detalle. Y me dijo que él buscaba en la casa. Eh, hacía que mi hija se escapara de la casa. Iban a un lugar cercano de donde mi hija vivía. En una, en una casa abandonada. Y allí él tenía relaciones con mi hija. Y entonces yo le, le, le respondí, de que, cómo era posible que él sub, tuviera, relaciones con una menor, que para colmo era del programa de educación especial. Que él me, él me dijo, que, que él la, que la nena era la que lo buscaba. A lo que yo le contesté, pero, ya tu eres hombre mayor con, con hijos, me conoces a mí.

[…]

T. Á. Pérez: Esa fue la primera vez que me entero, que él está sosteniendo esas relaciones, luego de eso sucedieron otros eventos…

[…]

Juez: Ok. No recuerda la fecha exacta, pero sabe el año…

T. Á. Pérez: Sí, recuerdo…

Juez: Verano, navidades…

T. Á. Pérez: Sí, recuerdo que fue para el, para el tiem(sic) para el año donde mi hija tenía 15 quince años de edad. La fecha pudo haber sido entre verano, entre verano y diciembre.

Juez: Pues, pero ¿de qué año?

F. Sánchez: ¿De qué año? ¿Qué edad tiene su hija ahora?

T. Á. Pérez: Mi hija tiene 18 años.

F. Sánchez: Ok. ¿Y sí su hija, se, tiene 15, que año, en qué año su hija pudo haber tenido 15?

T. Á. Pérez: Pudo haber sido como para 2019, 2020.

F. Sánchez: Ok. Luego de usted tener esa conversación con el señor Kenneth, en la casa de, del señor Kenneth. ¿Qué ocurre?

T. Á. Pérez: Yo me, me hablo con él, porque como le estaba explicando. Le dije que había un proceso que había, que él tenía que ser responsable. Luego de eso, me fui a mi casa. Este tomé un poco de agua, llamé al a, al abogado mío, él me hizo una, una orientación, y entonces me personé al cuartel de Caguas. A radicar la querella de, de delitos sexuales.

F. Sánchez: ¿Para qué año usted se acuerda que radi(sic) eh presentó esa querella de delito sexual?

T. Á. Pérez: En ese, ese mismo día que hablé con, con Kenneth, como para el 2019, 2020.[8]

Colegimos del testimonio antes transcrito, tanto de la víctima como de su padre, que, el propio apelante admitió tener relaciones sexuales con la perjudicada desde el año 2020. El apelante convencía a la menor para escaparse con él. Entonces, el apelante transportaba a la menor a una casa abandonada donde tenía relaciones sexuales con ella. Esto sucedió muchas veces durante el año 2020. El padre, después de confrontar al apelante, presentó una querella policiaca en contra de este en el año 2020.[9] Inclusive, como veremos, durante el año 2020 el apelante tenía la llave de la casa, y acostumbraba a entrar durante la noche al hogar de la menor en Gurabo. La madre de la perjudicada, señora Omayra Flores Rodríguez también testificó sobre cuando por primera vez quedó enterada de la actividad sexual entre el apelante y su hija. La madre de la víctima relató como cierta noche sorpresivamente encontró al apelante en la recámara de la víctima. Esto al salir del baño después de una ducha. Declaró que increpó al apelante sobre su presencia en el cuarto de la menor y este al ser confrontado huyo del hogar de la menor y su madre. Luego del contactar al padre, al día siguiente, acuden al cuartel de la policía, y después de una entrevista, la agente encargada de la investigación informó

---

[8] *Íd.*, págs. 71, 73, 74, 75.
[9] *Íd.*, págs. 104-105.

a la madre sobre la actividad sexual de la menor con el apelante. La señora Flores Rodríguez aseguró al tribunal que el encuentro y la visita al cuartel de la policía ocurrió a finales del año 2020 cuando su hija contaba con 15 años:

F. Sánchez: Ok. Por qué usted conoce al señor Kenneth Rabelo Rodríguez.

T. Flores: En el 2020, cuando Angélica tenía 15 años, la primera vez que lo vi, fue cuando lo sorprendí en el cuarto de mi hija.

L. Milán: Juez, si ella puede repetir eso.

Juez: Sí, ¿que en qué año?

T. Flores: En el 2020.

Juez: En el 2020, cuando su hija tenía 15 años. Lo sorprendió en el cuarto de la nena.

F. Sánchez: Se acuerda, aproximadamente ¿para qué mes del 2020, fue qué ocurrió ese evento?

T. Flores: Fue como para finales de noviembre por ahí.

F. Sánchez: Y le pregunto ¿En qué momento del día fue que usted encontró al señor Kenneth Rabelo en el cuarto de su hija?

T. Flores: Ok. Este ese día era como las 11:00 de la noche, yo me encontraba en mi hogar sola, con la nena, eh, eh, me encontraba saliendo del baño, porque me estaba bañando. Y oigo a mi perro ladrar. Eh como estaba constante ladrando, pues me di cuenta, que algo estaba extraño dentro de la casa. Cuando me dirijo en toalla al, a la sala, porque el cuarto de Angélica quedaba después de la sala. Este quedaba en la antesala. Cuando entro al cuarto de la nena sorprendo al, a Kenneth en el cuarto de mi hija.

F. Sánchez: Ok. En ese momento cuando usted sorprende a Kenneth en el cuarto de su hija. ¿Qué? ¿qué ocurre?

T. Flores: eh, este estaba asustada porque, pensaba que era al, alguien que se me metió a mi casa, porque en realidad yo no lo conocía. Del mismo susto lo que le dije fue que se fuera de mi casa. Qué, qué hacía ahí, que se fuera. Él sin mediar palabra salió del cuarto y salió corriendo de la casa.

[...]

F. Sánchez: Sí. Luego de que el señor eh, Kenneth Rabelo Rodríguez, se fuera de su casa, ¿Qué usted hizo, en relación a su hija?

T. Flores: Ok, eh le pregun(sic) este del mismo susto le digo qué, qué hacía él en el cuarto de ella.

Juez: Perdóneme que la interrumpa. ¿Ella estaba en el cuarto en ese momento?

T. Flores: Sí. Eh, le pregunto a ella qué, qué hacía ese caballero en el cuarto de ella. Y ella me dice que era un muchacho que ella había conocido. Le pregunto qué de dónde ella había conocido a ese muchacho, porque no sabía la edad, no sabía quién era y ella me dice que lo había conocido, este en Humacao que era vecino de su papá. En ese momento trato de contactar a papá, pero papá no me respondió en ese momento. Al otro día este esperé al...

L. Milán: No se le han hecho más preguntas, la pregunta fue qué le dijo la hija. No se le ha hecho ninguna otra pregunta.

Juez: Siguiente pregunta.

F. Sánchez: Sí. Eh qué ocurrió luego de que la hija le manifestara eso.

T. Flores: Ok. Eh me trato de comunicar con papá esa noche, y papá no eh respondió a mi llama(sic) cuando le llamé. Al otro día fue que papá me contesta la llamada. ¿Qué, qué había pasado? Y yo le explico y le pregunto por él.

F. Sánchez: ¿Qué usted le explica?

T. Flores: Le explico que encontré a, a Kenneth en, en el cuarto de la nena. Y que Angélica me había dicho que, que lo había conocido en Humacao. Y era su vecino.

F. Sánchez: Ok. Cuando usted le manifiesta eso, al papá de Angélica qué él le manifiesta devuelta.

T. Flores: El papá de Angélica me dice que va a hacer unas gestiones y en al mediodía en la tarde, pues me dice que me personara con Angélica en la comandancia de Caguas.

F. Sánchez: Qué hace usted una vez él le, le ¿verdad? le solicita esa infor(sic) esa, esa gestión.

T. Flores: Pues me persona con Angélica en la comandancia de Caguas. Ahí entrevistan, ahí entrevistan a Angélica. Y ahí es que yo me entero.

F. Sánchez: ¿Quién entrevista a Angélica?

T. Flores: La agente que está a cargo de la investigación.

F. Sánchez: ¿Recuerda el nombre de la agente?

T. Flores: No.

F. Sánchez: Usted dice que ahí se entera. ¿Se entera de qué?

T. Flores: Me entero, que Angélica se escapaba de mi casa con, con Kenneth en horas de la noche.

F. Sánchez: ¿Desde cuándo esto, estaba ocurriendo?

T. Flores: Ella dice que, que, de, cuando tenía, cuando venía que yo tenía su custodia. Ella se escapaba de mi casa con él. Y sostenía relaciones con él. Eso es lo que yo me entero en ese momento. Me entero también de la edad que tenía el caballero. Y ahí...

T. Flores: Para ese momento creo que él tenía 28 o 29 años no sé por ahí.

F. Sánchez: Y su hija ¿qué edad tenía?

T. Flores: 15.

[...]

Juez: En lugar de, déjeme preguntarle algo antes que se me olvide. Usted dice que, que ahí usted se entera que su hija sostenía relaciones con él. Usted se entera de eso ¿cómo?

T. Flores: Por la entrevista que le hizo la, eh el, el agente investigador y me lo hace saber.

Juez: El agente se lo dice a usted.

T. Flores: Exacto.

Juez: Ok. Su hija no...

T. Flores: No, el agente.

Juez: Ok.

F. Sánchez: Ok.

Juez: Relaciones, ¿Qué tipo de relaciones le dijo el agente?

T. Flores: No, él solamente, me, me indicó que Angélica había tenido relaciones sexuales con él.

Juez: Relaciones sexuales.

T. Flores: Sí.

F. Sánchez: Luego de recibir esa información, ¿qué ocurre?

T. Flores: Pues refieren eh, el caso a delito sexuales. Activan el protocolo del Departamento de la Familia.

F. Sánchez: Una vez refieren el caso a delitos sexuales ¿Qué ocurre allí?

T. Flores: Pues eh, papá como tenía información sobre él. Porque yo no lo conocía. Eh este va al Tribunal y pide una orden ex parte, una orden de protección.

F. Sánchez: Una orden de protección, a favor ¿de quién?

T. Flores: De Angélica.

F. Sánchez: ¿Y en contra de?

T. Flores: De Kenneth Rabelo.[10]

Una semana después del evento antes relatado, el apelante volvió al hogar de la menor, pero fue sorprendido por la madre de la perjudicada. La testigo relató lo ocurrido en esa ocasión:

F. Sánchez: Luego de solicitar esa orden de protección ¿qué ocurre?

T. Flores: Luego de eso eh, como te diría como una semana después, sucede otra vez que, en la noche, veo que abren la puerta con llave, y ahí...

Juez: Perdóneme, perdóneme que le interrumpa. Usted dijo que, que el papá pidió una orden de protección.

T. Flores: Sí.

Juez: Se la dieron, no se la dieron.

T. Flores: Sí, se la dieron.

Juez: ¿Ese mismo día?

T. Flores: Creo que fue al otro día.

Juez: Al otro día.

T. Flores: Mjm.

Juez: Ok, ahora sí Fiscal, continúe y perdóneme.

F. Sánchez: ¿Todavía estamos ubicados en el 2020?

T. Flores: Sí. Estamos ubicados en el 2020. Y luego que pasó ese suceso. Le puede decir como una semana después, me encontraba en mi casa. Eran, era tarde en la noche y estoy en la cocina y oigo que mi puerta se abre. Con llave y yo me encontraba sola con la nena de otra vez. Y veo que ese caballero entra a mi casa.

F. Sánchez: Cuando usted dice este caballero ¿a quién usted se refiere?

T. Flores: A Kenneth Rabelo.

F. Sánchez: Mjm.

T. Flores: Entra a mi casa y me percato que él tenía llave de mi casa. Ahí como sé que él tenía una orden protección ex parte, me dirijo al cuartel de Gurabo, donde me atiende, la, me, me atiende la agente López.

---

[10] *Íd.*, págs. 113-116.

F. Sánchez: En ese momento, cuando usted lo vio entrar con las llav(sic) abriendo la puerta con sus llaves. ¿Qué usted hizo si algo, en relación, a él?

T. Flores: Pues este me paro de frente. Y cuando él me ve sale corriendo.

F. Sánchez: Ok.

T. Flores: Ahí mismo cojo la menor, la monto en mi guagua y me dirijo al cuartel del Gurabo. Donde me atiende la agente López.

F. Sánchez: Mjm.

T. Flores: Ahí, pues le indico al agente, que hay una orden de protección y ella este, llama al cuartel de Humacao. A ver si habían diligenciado esa orden.

L. Milán: Yo tengo objeción, a cualquier información de, que dé un testigo, u, una falta aquí que no es, que no es testigo del caso.

Juez: No ha lugar, se permite. Pero no probar la verdad del aseverado, de que existe o no existe la orden.

F. Sánchez: Puede continuar.

T. Flores: La agente López llama al cuartel de Humacao. A ver si había diligenciado esta, esa orden de protección para ser, para proceder a la orden de arresto. Porque él había violado la orden de protección. Y ahí nos enteramos, que no la había diligenciado. Y por eso fue, que no se produjo el arresto.

F. Sánchez: Ok. A raíz de ese incidente qué iniciativa usted tomó ¿verdad? para salvaguardar la seguridad de su hija.

T. Flores: Pues llamo a papá y le digo que se lleve a la menor, porque siento que en mi casa no estaba segura. Ya pues que descubrí que él tenía llaves de mi casa. Y papá viene y busca la menor. A lo que yo hago gestiones para cambiar cerraduras y todo. Y entonces la menor se queda con papá.[11]

Presentada la querella por el padre de la víctima, comenzó una investigación por la División de Delitos Sexuales, y la menor fue referida al Departamento de la Familia. La querella fue asignada a la agente Mari Lisa Dones Román. La agente entrevistó a la menor y a sus progenitores. La agente testificó sobre el resultado de sus entrevistas. Relató como la víctima explicó la forma en que conoció a la parte apelante y las primeras dos veces

---

[11] *Íd.*, págs. 116-118.

que sostuvo relaciones sexuales con el apelante cuando acudía a la casa de su padre en Humacao. La agente también testificó como la padre relató el momento en que su padre fue a confrontar al apelante y este admitió al padre sostener relaciones sexuales con ella. La agente testificó que la madre explicó como había tramitado varias órdenes de protección en contra del apelante, por este merodear su casa de forma frecuente. Por último, expresó que el padre de la menor le entregó dos celulares propiedad de la víctima:

F. Sánchez: Agente le pregunto ¿cuál fue su intervención en el caso que tenemos en el día de hoy?

A. Dones: Bueno, para enero 2020. Se me asignó a mí una querella. Esa querella la, la menor se llamaba Angélica. Eh, ella...

F. Sánchez: ¿Angélica qué?

A. Dones: Angélica, no recuer(sic) no estoy segura, si Pérez, no me acuerdo del nombre completo. Sé que su papá es Pérez. Este entonces pues procedí a investigar y a entrevistar la menor.

F. Sánchez: Ok.

A. Dones: Que para ese entonces tenía 15 años. Por eso es que era menor.

F. Sánchez: Le pregunto ¿qué surge de su investigación, en ese caso?

A. Dones: Pues, para ese tiempo, hablando del 2020.

F. Sánchez: Mjm.

A. Dones: Cuando yo la entrevisto ella me indica, que conoce al señor Kenneth Rabelo. Que lo conoció en Humacao, eh ella tenía relaciones, eh compartida es que se dice, relaciones paternofiliales. Mejor dicho.

F. Sánchez: Mjm.

A. Dones: Con su papá entonces, ese, en esos días estaba compartiendo con su papá conoció a Kenneth. Porque era vecino de su papá.

F. Sánchez: Ok. Eh, a qué otras personas usted entrevistó, como parte de, de su investigación.

A. Dones: A su papá y a la mamá.

F. Sánchez: Qué le manifestó eh, la menor Angélica Pérez, eh en relación al señor Kenneth Rabelo, eh en este caso.

A. Dones: Pues ella in, ella indicó que una vez lo conoció, que conocieron porque ella salió a caminar por el, por el área ¿verdad? donde reside su papá en Humacao. Que se compartieron los teléfonos. Eh se empezaron a textear, ellos se citaron. Una, en una de las ocasiones que se citaron allí mismo, fueron a una residencia abandonada. Que allí tuvieron en una primera ocasión, tuvieron sexo oral entre ambos. En una segunda ocasión, eh tuvieron sexo. ¿verdad? que él tiró, que él la tiró al piso, y que tuvieron relaciones sexuales.

F. Sánchez: Le pregunto ¿cuál era la edad de la menor Angélica Pérez para, para esos eventos del año 2020?

A. Dones: Ella tenía 15 años.

[…]

F. Sánchez: ¿De qué manera se entera el papá de Angélica sobre ¿verdad? la existencia de la Kenneth en ese momento?

A. Dones: Porque Angélica se lo había dicho. Y también se lo había dicho una sobrina de él.

F. Sánchez: ¿Qué más le manifestó el, el, padre de Angélica en ese momento?

A. Dones: Pues que, pues que él se dirigió a casa de, a la casa de Kenneth, para como confrontarlo y preguntarle que qué es lo que había sucedido, eh una vez habla con su, con su papá le pide por favor que Kenneth salga, salga de la residencia. Él sale, hablando que Kenneth, entonces él le pregunta que, qué paso con su hija, que sí, le, le había dicho dime la verdad. Tú tuviste relaciones sexuales con mi hija. Y él le dijo que sí. Que él había tenido relaciones sexuales con su hija, pero que ella era quien lo buscaba a él.

A. Dones: Sí.

F. Sánchez: ¿Qué surgió de su investigación?

A. Dones: La mamá, la mamá lo que indica es que ha tenido varias órdenes de protección contra Kenneth. Porque, él se pasaba por su casa. La menor se había escapado en varias ocasiones de su residencia para verse con, con Kenneth. Y entonces ella había tenido que poner unas órdenes de protección.

F. Sánchez: Eh le pregunto ¿qué, como parte de su investigación qué evidencia usted ocupó en ese caso?

A. Dones: Se llegaron, se llegaron a ocupar unos teléfonos celulares.

F. Sánchez: ¿Qué se hizo con esos celulares?

A. Dones: Esos teléfonos celulares, se enviaron al AIS [sic].

F. Sánchez: ¿Con qué propósito se enviaron al AIS [sic]?

A. Dones: Se enviaron, para ver si tenía algún tipo de pornografía ya, los teléfonos eran, como un poco peculiar uno era de tamaño normal y otro era un, teléfono sumamente pequeño, pequeñito, y se enviaron al AIS para ver si tenía algún tipo de, de pornografía o material que el AIS [sic], pudiera asumir jurisdicción de, del caso.

F. Sánchez: Eh, ¿Quién le, le había entregado esos teléfonos inicialmente a usted?

A. Dones: Su papá.[12]

En cuanto al factor tiempo, elemento disputado por la parte apelante, basta recordar la naturaleza y violencia de la agresión y que, de "ordinario, para un testigo es sumamente difícil precisar las fechas y las horas". E. Altavilla, *Sicología Judicial* (S. Carrejo y J. Guerrero, trads.), Buenos Aires, Ed. Temis, 1970, Vol. II, pág. 524. Esta dificultad se acentúa en casos de personas objeto de ataques, y de abusos sexuales como ocurrió en este caso. Sin embargo, la propia víctima testificó sobre al menos un encuentro sexual con el apelante mientras contaba con 15 años, y agregó que, tales encuentros sucedían varias veces en una semana, esto mientras era menor de 15 años.

El recibo de los teléfonos móviles tiene fecha del 15 de diciembre de 2020, cuando la menor contaba con 15 años. Esto sucedió al próximo día del padre haber confrontado al apelante sobre la relación con su hija, y este haber admitido tener relaciones sexuales con la menor. Como vimos, para finales de aquel año la menor ya sostenía relaciones sexuales semanalmente, con el apelante, en Las Piedras en una casa abandonada y en el

---

[12] *Íd.*, págs. 157-159.

propio hogar de la menor. En específico, entre los testimonios de la víctima, sus padres y la agente Dones podemos colegir sin ambages que, ya para la fecha del 15 de diciembre de 2020 la víctima había sufrido mínimo una agresión sexual por el apelante, por penetración vaginal mientras la víctima contaba con 15 años. Un solo acto de tal calaña es suficiente para transgredir el bien jurídico protegido por el Artículo 130(A) del Código Penal. Los testimonios de sus padres, y la agente investigadora corroboraron tales hechos y también confirmaron la regularidad de las agresiones sexuales en contra de la entonces adolescente de 15 años. No es necesario presentar un certificado de nacimiento para demostrar la edad de la víctima. Tampoco precisa nuestro ordenamiento comprobar la fecha y hora para cada acto de agresión sexual. Basta con evidencia directa de un testigo que le merezca al juzgador entero crédito para probar como suficiente un hecho.

La Regla 110 de las Reglas de Evidencia, 32 LPRA Ap. VI R. 110, dispone lo relacionado a la suficiencia de la prueba para que un hecho quede establecido o demostrado. En lo pertinente, el inciso "d" de la referida Regla expone que "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley". Aunque la víctima en este caso efectivamente incurrió en contradicciones e inconsistencias, estas no versan sobre "los puntos verdaderamente críticos de su testimonio" sino que, refieren a "detalles y hechos sobre los cuales la mente humana puede olvidar y confundir". *Pueblo v. Cabán Torres*, *supra*, pág. 656. Recordemos que, la vieja norma de "*falsus in uno, falsus in ómnibus*, que exigía sin adecuada base ni en la razón o la experiencia, que se repudiase la totalidad del testimonio en estos

casos" ha sido rechazada por nuestro más alto foro. *Pueblo v. Cruz Negrón,* 104 DPR 881, 883 (1976).

La credibilidad consiste en realizar un ejercicio valorativo de asignarle "certeza o probabilidad sobre una versión de los hechos o acontecimientos incidentales al caso". *Pueblo v. Colón, Castillo, supra,* pág. 581. Corresponde al juzgador de hechos efectuar un ejercicio de cálculo de probabilidades y posibilidades "sobre la totalidad de la prueba", y solo deberá "valerse del sentido común, la lógica y la experiencia para deducir cuál de las versiones, si alguna, prevalece sobre las otras" pues "[l]os criterios que guían la evaluación de la prueba en un juicio son idénticos a aquellos que utilizamos en la vida cotidiana, tales como el comportamiento y el carácter de quienes dan su versión de los hechos, la parcialidad que pueda afectarles, la naturaleza de la declaración y otros". *Íd.,* pág. 578.

El señalamiento del apelante en cuanto a "ausencia total de prueba pericial" es frívolo. Las declaraciones de los testigos durante el juicio son suficientes y satisfactorias para establecer el elemento de penetración vagina pene, y también para establecer el acto de sexo oral entre el apelante y la víctima. Igualmente, quedó demostrada la carencia de capacidad mental suficiente de la víctima para consentir al acto sexual. *Pueblo v. García Pomales,* 94 DPR 224, 226-228 (1967). Nuestro ordenamiento jurídico presume falta de consentimiento para participar en un acto sexual por razón de inmadurez sicofisiológica, física y emocional a la edad de 15 años. *Pueblo v. Rivera Robles, supra,* págs. 874-875. Esto quedó probado con el testimonio irrefutado de la víctima, sus padres, y la agente Dones. No es necesaria prueba científica o de otra índole para corroborar tales elementos. *Pueblo v. Pérez Rivera, supra,* pág. 321; Véase, *Com. de la Mujer v. Srio. de Justicia,* 109 DPR 715 (1980).

En cuanto al segundo señalamiento de error, el que versa sobre la admisión errónea de cierta evidencia sobre el contenido de mensajes electrónicos intercambiados entre la víctima y el apelante, consideramos tal error como no perjudicial. Un error no perjudicial (*harmless errors)*, no afecta el resultado del juicio. *Pueblo v. Santos Santos*, 185 DPR 709, 728 (2012). La admisión errónea de la evidencia señalada por el apelante no fue un factor decisivo o sustancial en su juicio y no altera su veredicto de culpabilidad.

Notamos que, fue sumamente difícil para los padres romper el vínculo de abuso creado por el apelante sobre la víctima. El esfuerzo duró varios años, hospitalizaciones en centros de salud mental, visitas regulares a profesionales de la salud mental, y a pediatras. Tanto el padre como la madre de la víctima tuvieron que tramitar varias órdenes de protección en contra del apelante pues el apelante seguía al acecho de la menor, merodeando el hogar de la menor, el trabajo de la madre, y perseguía a la madre de la menor cuando esta transitaba a su hija a la escuela y a la casa.[13] La menor estuvo bajo la influencia del apelante durante varios años después de los eventos relatados en esta sentencia. La víctima seguía escapándose, inclusive el apelante también abusó físicamente de la menor. Definitivamente la menor quedó atrapada por los designios del violador que aprovechó la situación de minoridad de la víctima para gratificar un deseo carnal prohibido por nuestro ordenamiento criminal. Toda persona que, a propósito, con conocimiento o temerariamente lleve a cabo, un acto orogenital o una penetración vaginal a una víctima que al momento del hecho no ha cumplido 16 años debe cumplir una pena de reclusión por un término fijo de 50 años. Artículo 130 (A) del Código Penal, *supra.*

---

[13] *Íd.*, págs. 126-128, 144-149.

Hay que recordar que todo acusado tiene derecho a un juicio justo, que no significa necesariamente un juicio perfecto. *Pueblo v. Díaz Ríos*, 107 DPR 140, 143 (1978). El apelante no puede reclamar ese tipo de juicio. El testimonio de la víctima se mantuvo fiel en cuanto al relato esencial de la traumática experiencia sufrida. En lo básico fue corroborado por otras personas cuya credibilidad no está en juego. El juzgador de hechos evaluó todos estos testimonios a la luz de los planteamientos de la defensa. Lo hallaron culpable. No podemos en apelación, con solo un récord frío e inexpresivo, sustituir esa apreciación. *Pueblo v. Cabán Torres*, 117 DPR 645, 656-657 (1986); *Pueblo v. Cruz Negrón*, 104 DPR 88, 883 (1976). La prueba desfilada es suficiente y demostró su culpabilidad más allá de duda razonable. En ausencia de prejuicio, parcialidad o error manifiesto, no es nuestra función alterar el dictamen apelado.

### *-IV-*

Por los fundamentos antes expuestos, los que hacemos formar parte de este dictamen, *confirmamos* la sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones